## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **WILLIAM HARRISON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **CIVIL ACTION 20-0360-WS-N** |
| | ) |
| **STEVE JAMES FORDE,** | ) |
| | ) |
| **Defendant.** | ) |

## ORDER

This matter is before the Court on the plaintiff's motion for summary judgment as to the defendant's counterclaim. (Doc. 42). The parties have submitted briefs and evidentiary materials in support of their respective positions, (Docs. 42-43, 51, 60), and the motion is ripe for resolution. After careful consideration, the Court concludes the motion is due to be granted.

## BACKGROUND

The plaintiff filed suit against the defendant, seeking recovery of approximately $5.6 million in compensatory damages and an unspecified additional amount in punitive damages. The defendant's counterclaim alleges that, in the course of seeking to effect service of process, the plaintiff and/or his agents defamed him. (Doc. 14 at 9-10). The plaintiff argues that the statement challenged as defamatory was made by a process server and that the process server was not his agent for purposes of the defendant's defamation claim.

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11ᵗʰ Cir. 1991).  The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden."  *Id*.  "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial."  *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11ᵗʰ Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11ᵗʰ Cir. 1992).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made."  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11ᵗʰ Cir. 1993); *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact."  *Fitzpatrick*, 2 F.3d at 1116.  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …."  *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11ᵗʰ Cir. 2003).  "Therefore, the [non-movant's] version of the facts (to the extent

supported by the record) controls, though that version can be supplemented by additional material cited by the [movants] and not in tension with the [non-movant's] version." *Rachel v. City of Mobile*, 112 F. Supp. 3d 1263, 1274 (S.D. Ala. 2015), *aff'd*, 633 Fed. Appx. 784 (11th Cir. 2016).

"There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); *accord Gennusa v. Canova*, 748 F.3d 1103, 1116 (11th Cir. 2014). The Court accordingly limits its review to those arguments the parties have expressly advanced.

The plaintiff filed this action in July 2020. (Doc. 1). From the inception of the lawsuit, the plaintiff has been represented by the same law firm ("B&W"). When the 90 days for service of process allowed by Rule 4(m) elapsed, the plaintiff sought and received additional time for service, based on his description of substantial efforts to locate the defendant, through three different private investigation companies, in Alabama, Tennessee, and at sea. (Docs. 8-11).

To assist in efforts to locate and serve the defendant, B&W contacted OEX Global, LLC, a private investigation company owned by Matt May.[1] May submitted a proposal to B&W and Ropes & Gray ("R&G"), the plaintiff's general counsel. May then discussed the proposal with B&W. May was thereafter hired by B&W. May invoiced B&W, and he was paid via B&W checks. (Doc. 43-1 at 5-6; Doc. 43-2 at 5, 9-10, 12-13, 16).

On December 2, 2020, May posted an anonymous advertisement on Operation Identity's Facebook page, targeting users in locations the defendant was known to have traveled. No one reviewed the ad before May posted it. The post described the defendant as a "known grifter and con artist." May removed the

---

[1] The parties refer to May and OEX interchangeably. For convenience, the Court refers only to May.

quoted language from the ad the same day, after R&G advised him to do so.  (Doc. 43-2 at 27-28; Doc. 51-6 at 1).

Service was accomplished by personal service in the Turks & Caicos on December 5, 2020.  (Doc. 12-1).

The plaintiff argues he is entitled to summary judgment because he did not personally make the allegedly defamatory statement and did not know of it or approve of it before it was made.  (Doc. 42 at 9-10).  The defendant argues this is irrelevant, because:  (1) B&W was the plaintiff's agent; (2) May was B&W's agent and thus the plaintiff's subagent; and (3) under Alabama law, a principal is responsible for defamatory statements made by his agent or subagent.  (Doc. 51 at 8-13).[2]

### A.  Principal's Liability for Intentional Torts by Agent or Subagent.

"For [the principal] to become liable for the alleged intentional torts of its agent, the plaintiffs must offer evidence that the agent's wrongful acts were [1] in the line and scope of his employment …; or [2] that the acts were in furtherance of the business of [the principal] …; or [3] that [the principal] participated in, authorized, or ratified the wrongful acts …."  *Todd v. Modern Woodmen of America*, 620 So. 2d 591, 593 (Ala. 1993) (internal quotes omitted, bracketed material in original).  "[A] principal is liable for the intentional torts of its agent – even if the agent's acts were unknown to the principal, were outside the scope of the agent's authority, and were contrary to the principal's express directions – if the agent's acts were in furtherance of the principal's business and not wholly for the gratification of the agent's personal objectives."  *SouthTrust Bank v. Jones, Morrison, Womack & Dearing, P.C.*, 939 So. 2d 885, 905-06 (Ala. Civ. App. 2005).

---

[2] The parties agree that Alabama law governs the resolution of the instant motion. (Doc. 42 at 10-11; Doc. 51 at 8-13).

While the foregoing test is most often used in the employer-employee context, it has been imported to the client-attorney context. *SouthTrust Bank*, 939 So. 2d at 905; *see Adams v. Tractor & Equipment Co*., 180 So. 3d 860, 870 (Ala. 2015) (*SouthTrust* "hold[s] that a client can be liable for the tortious conduct of his attorney"). The defendant relies on this rule, (Doc. 51 at 8-10), and the plaintiff does not deny that the *Todd* formulation governs in the attorney-client arena.

"When one employs an agent who has either express or implied authority to employ a subagent, the subagent will also be the agent of the principal …." *Booker v. United American Insurance Co*., 700 So. 2d 1333, 1335 (Ala. 1997) (internal quotes omitted); *accord Consolidated Underwriters Insurance Co. v. Landers*, 235 So. 2d 818, 822 (Ala. 1970) (the acts of a subagent, hired by an agent possessing express or implied authority to do so, "are in effect the acts of the agent," and "[t]his may mean, in turn, that they are the acts of the [principal]"); *Eagle Motor Lines v. Hood*, 55 So. 2d 126, 129 (Ala. 1951) ("[W]hen an agent … has the implied authority to appoint a subagent …, such subagent thereby becomes an agent of the principal."). The defendant relies on this rule, (Doc. 51 at 11), and the plaintiff does not dispute that it accurately expresses governing law.

## B.  Attorney as Agent of Client.

The plaintiff argues that whether B&W was his agent with respect to retaining May must be determined by the "reserved right of control" test generally applicable under Alabama law to questions of whether one is an agent or an independent contractor. (Doc. 60 at 1-2). The plaintiff does not present any evidence or argument to support the proposition that B&W was merely an independent contractor; instead, he faults the defendant for not presenting evidence that B&W was not an independent contractor. The threshold problem with this approach is that the Court is considering the plaintiff's motion for summary judgment, so the initial burden falls on him, not on his opponent. The

plaintiff's failure even to attempt a demonstration that B&W was an independent contractor in retaining May is thus fatal to his argument.

Separately fatal to the plaintiff's position is his failure to show that Alabama employs the fact-intensive "reserved right of control" test in the attorney-client context. On the contrary, and as the defendant points out, (Doc. 51 at 8-11), Alabama has described the lawyer's status as an agent in more sweeping terms.

"An attorney is the duly authorized agent of his client and his acts are those of his client. The client is, therefore, bound by the act of his attorney in the course of legal proceedings in the absence of fraud or collusion …." *SouthTrust*, 939 So. 2d at 903 (internal quotes omitted). This agency is not unlimited. "An attorney employed to represent a litigant in the prosecution or defense of a suit is a special agent of his client and has no implied or inherent authority or right to compromise and settle it." *Crawford v. Tucker*, 64 So. 2d 411, 416 (Ala. 1952); *accord Mitchum v. Hudgens*, 533 So. 2d 194, 199 (Ala. 1988). As a special agent, a lawyer's "general authority … is usually limited in both duty and authority to the vigilant prosecution or defense of the rights of the client." *Id*. (internal quotes omitted).

The plaintiff argues that an attorney's special agency extends only to actions that are "done with the intent to bind the client." He continues that, because B&W retained May in its own name and paid May out of its own funds, B&W lacked the intent to bind the plaintiff. Thus, he concludes, B&W was not his agent when it retained May. (Doc. 60 at 3-4).

The plaintiff has not established his proposed "intent to bind the client" restriction on an attorney's agency. It is true that the cases on which the plaintiff relies involve in-court conduct (and a settlement), where the attorney's intent to bind is clear, but he identifies nothing in these cases that purports to make the attorney's subjective intent to bind the client a *sine qua non* of his agency. Nor does he explain how such a restriction can be read into Alabama's broad

descriptions of the scope of an attorney's agency as "act[s] … in the course of legal proceedings" and "the vigilant prosecution or defense of the rights of the client."  Service of process plainly is an act in the course of legal proceedings and part of the vigilant prosecution of a lawsuit.  Had B&W effected service itself, it would be idle to suggest it had not done so as the plaintiff's agent.  By farming out its responsibility for service to a third party, then, B&W necessarily acted as the plaintiff's agent.

The plaintiff stresses that B&W did not intend to bind him *contractually* to May, but that is the wrong frame of reference.  The question – to the extent that B&W's intent to bind is relevant – is not whom B&W intended to pay May's bills but whom B&W intended to be bound by May's service efforts.  It cannot seriously be argued (and has not been argued) that B&W did not intend the plaintiff to reap the benefits of May's successful service of process or to suffer the consequences of any failure of service.

The plaintiff next asserts that the cases addressing an attorney's agency involved "wrongdoing by the attorney that caused harm to the client," such as a failure to appear resulting in dismissal of the client's lawsuit.  (Doc. 60 at 3).  The plaintiff's point is unclear.  To the extent he argues that a third party harmed by an attorney's wrongdoing can have no cause of action against the client, he is incorrect because, as noted above, *SouthTrust* "hold[s] that a client can be liable for the tortious conduct of his attorney."  *Adams*, 180 So. 3d at 870.[3]  To the extent he argues that "there is no allegation that [B&W] acted tortiously," (Doc. 60 at 4),

_____

[3] "[A]ccording to the ordinary rules of agency, a client may be bound by … the tortious … prosecution of legal proceedings to enforce the client's claim …."  939 So. 2d at 904 (internal quotes omitted).  In *SouthTrust*, the client was deemed "vicariously liab[le]" for its lawyers' conduct in suing, serving by publication, obtaining default judgment against, and recording judgment against, an individual that was not a guarantor of the loan at issue, all of which actions "were attributable to the [client] Bank."  *Id*. at 903, 906-07.

that is irrelevant, since there is an allegation that May, as B&W's subagent (and thus as the plaintiff's agent) did so.

Finally, the plaintiff retreats to a parade of horribles, insisting that deeming B&W his agent in retaining May will result in such absurdities as a client being sued by a motorist when his lawyer causes a wreck on her way to court. (Doc. 60 at 3). Perhaps, but only if Alabama courts deem driving a car to be "vigorous prosecution or defense" of a lawsuit. Such a result seems unlikely but is in any event no basis for considering a lawyer's retention of an outside process server to be beyond the bounds of his agency.

As the plaintiff's litigation attorney and thus the plaintiff's agent for effecting service of process as part of the vigorous prosecution of the plaintiff's lawsuit, B&W had implied authority to retain a process server to accomplish this task. The plaintiff has further admitted that B&W was actually authorized to hire May. (Doc. 10 at 5 (acknowledging that "the Plaintiff hired" May). The plaintiff makes no argument that B&W had authority to retain an independent contractor but no authority to retain a subagent. Accordingly, if May was an agent of B&W, the plaintiff is exposed to vicarious liability for May's alleged defamation of the defendant under *Booker* and the other authorities cited in Part A.

### C. Process Server as Agent of Attorney.

The parties agree that whether May acted as B&W's agent or as an independent contractor depends on whether B&W retained a right of control. (Doc. 51 at 12; Doc. 60 at 5). "The test … is whether [B&W] has reserved the right of control over the means and method by which [May's] work will be performed …." *Bain v. Colbert County Northwest Alabama Health Care Authority*, 233 So. 3d 945, 955 (Ala. 2017) (internal quotes omitted). "[T]he one for whom the work is done may reserve the right to supervise the one doing the work, for the purpose of determining if the one doing the work is performing in conformity with the contract, without converting the relationship into that of

8

master-servant." *Donaldson v. County Mutual Insurance Co.*, 291 So. 3d 1172, 1176 (Ala. 2019) (internal quotes omitted).

The defendant identifies the following as creating a jury question as to whether B&W retained the requisite right of control:  (1) B&W directed May as to the person to be served (the defendant) and with what he was to be served (process); (2) B&W directed May as to the jurisdiction in which the defendant was served; (3) B&W directed May to keep his efforts clandestine so as not to tip off the defendant that someone was trying to serve him; (4) B&W directed May whether to set up a meeting with the defendant at which to serve him; (5) B&W directed May whether to run non-attributable Facebook ads; and (6) B&W approved the content of the ads.  (Doc. 51 at 13).  The defendant merely lists these circumstances without offering any argument as to any of them.  The Court nevertheless considers them in turn.

"For one to be an agent, the other party must retain the right to direct the manner in which the business shall be done, as well as the results to be accomplished, or, in other words, not only *what* shall be done, but *how* it shall be done." *Brown ex rel. Brown v. Commercial Dispatch Publishing Co.*, 504 So. 2d 245, 246 (Ala. 1987) (emphasis added).  Serving the defendant (rather than some random Joe) with process (rather than a magazine or a menu) is not the how of the business, it is the what.

There is no evidence that B&W instructed May where to serve the defendant.  On December 3, 2020, May notified B&W and R&G that the defendant had been located aboard a yacht at a marina in Provinciales, Turks and Caicos but that he might sail for the Bahamas.  (Doc. 51-3 at 11).  B&W (which was researching service requirements outside the United States) asked May, "[D]o we have a best guess idea where we will attempt service?"  (*Id*. at 10).  This communication patently was a request for information about where May would decide to serve the defendant, not a direction from B&W as to where to serve him.

Nor, by responding, "We'd like to attempt service at the Marina," (*id*. at 9), did May "s[eek] Plaintiff's Counsel's approval" of doing so.  (Doc. 51 at 4).

On November 11, 2020, in response to a question from May about creating a non-attributed Facebook ad, B&W said, "if you believe that will help and won't tip him off more, then I have no problem."  (Doc. 51-5 at 1).  Assuming without deciding that by this statement B&W directed May to keep his service efforts clandestine, the direction implicates the what of the business, not the how.  As the defendant acknowledges, (Doc. 51 at 3), May was engaged to "locate and serve" the defendant.  (Doc. 51-1 at 7).  B&W had good reason to believe the defendant was evading service, (Doc. 10 at 5-6), and alerting him prematurely that he was being sought could well have made service (the ultimate goal) impossible.[4]  The defendant offers no authority for the unlikely proposition that directing a contractor to solve one problem without creating another transforms the contractor into an agent.[5]

There is no evidence that B&W directed May whether to set up a meeting at which to serve the defendant.  In November 2020, May devised a plan to set up a meeting with the CEO of a company with which the defendant was closely connected, on the pretext of being a potential investor, in hopes of luring the defendant to the meeting, where he could be served.  May was already executing the plan when, on November 3, he provided B&W and R&R a "quic[k] recap." (Doc. 51-4).  Two days later, R&G asked if there were "any updates."  (*Id*. at 3). May reported that the plan was proceeding, that he had spoken with the CEO, and

---

[4] As it was, efforts to locate and serve the defendant ended up costing almost $50,000.  (Doc. 10-1 at 1; Doc. 43-2 at 16).

[5] By the defendant's logic, a repairman hired to fix a piece of factory equipment would become the owner's agent if the owner required the repairs to occur after hours so as not to disrupt operations, and a builder hired to construct a privacy fence would become the homeowner's agent if she instructed him not to damage her shrubs when erecting the fence.

that a second call was set for the next day, where May would propose a face-to-face meeting.  (*Id*. at 2).  R&G responded, "Thanks, Matt, this is helpful.  Keep me posted."  (*Id*.).  On November 7, May provided a "summary update," which included having set up the face-to-face for November 12 and having made clear to the CEO that the defendant's presence was necessary.  He concluded, "[i]f you want to discuss our approach for next week, or our discussions let's talk Monday Morning."  (*Id*. at 1).  R&G responded, "Thanks for the update.  I was tied up today but could have a call to discuss tomorrow if that works for you all – let me know.  I think this plan sounds fine, but I just want to make sure we can ensure that Forde will be at the meeting."  (*Id*.).

Nothing in this exchange remotely suggests that B&W was calling the shots on whether to proceed with May's plan.  As a threshold matter, only R&G – not B&W – participated in this conversation.[6]  Second, R&G sought only a discussion and a clarification of the plan, not a veto power over it.  Third, R&G's only interest was ensuring the defendant would be present, which was consistent with the goal of not alerting the defendant he was being sought for service until service was accomplished.  R&G was thus at most supervising May to determine if he was performing in conformity with the contract.  Nor did May, by providing updates and offering to discuss the plan he had already implemented, "s[eek] approval" of the plan.  (Doc. 51 at 5).

There is no evidence that B&W directed Forde whether to run non-attributable Facebook ads.  On November 11, 2020, May asked B&W and R&G, "How do you all feel about our firm creating a non-attributed Facebook page where we run ads in known areas of operation of Steve to get folks to report Steve and Tonya sightings to a private email, and phone number we set up?"  (Doc. 51-5

---

[6] The defendant explicitly limits his theory of agency and sub-agency to "Plaintiff's counsel," and he explicitly defines "Plaintiff's counsel" as limited to B&W to the exclusion of R&G.  (Doc. 51 at 2, 5, 10, 11).

at 2).  B&W responded, "Y'all are the experts … I trust your judgment … if you believe that will help and won't tip him off more, then I have no problem."  (*Id.* at 1).  R&G concurred.  (*Id.*).  This is the only instance of May seeking input, and it plainly was not a request for permission to proceed, (Doc. 51 at 5), but only a solicitation of thoughts about the approach.  Nor did B&W try to control the decision; on the contrary, B&W left the decision completely to May, only reminding him of the need not to alert the defendant.[7]

It is uncontroverted that B&W did not create, approve, or know about the allegedly defamatory material in the Facebook ad until after the ad was posted on December 2, 2020.  (Doc. 43-2 at 27-28).  Upon discovering the language a few hours after the ad went live, R&G advised May to remove it from the ad, and May promptly did so.  (Doc. 51-6 at 1).  After the language had been removed, R&G asked for confirmation and added, "going forward, it's very important that you run language by me or [B&W] to review before it goes out."  (*Id.*; Doc. 51-7 at 2).  May responded, "Absolutely, going forward we will certainly [run] language by the legal team ….  For now we are on standby until you all give us the green light to start running additional ads."  (*Id.* at 1).  Two days later, May asked B&W, "Where are we at with approval to push out more ads (after your approval of the content)?"  (Doc. 51-3 at 9-10).  While the defendant may have evidence that R&G reserved a right to control the content of ads, he has not shown that B&W had or claimed such a right.[8]  Moreover, the defendant's evidence does not reflect a reserved right of control existing at the time of the allegedly defamatory publication (as by a reprimand that May had violated an understanding that he obtain pre-approval of the language in the ad); on the contrary, it reflects that R&G reserved control of content only in the future, "going forward."  The

---

[7] To continue an earlier analogy, if a builder asked the homeowner how she felt about his using a ladder to construct a privacy fence, she would not become a principal by responding that the decision was up to him as long as he didn't harm the shrubbery.

[8] *See* note 6, *supra*.

defendant's evidence therefore cannot support a finding that May, at the time of the alleged tort, was B&W's agent.  The defendant offers no argument to the contrary.

Unable to identify a genuine issue of material fact as to B&W's reservation of a right to control the means and method at the relevant time, the defendant notes that, in trying to locate and serve the defendant, May was acting in the line and scope of what he was asked to do.  (Doc. 51 at 3, 13; Doc. 51-1 at 7).  That would be relevant to the plaintiff's liability under *Todd* were May acting as B&W's agent, but it does not create an agency relationship.  Similarly, the defendant stresses that service of process was work undertaken by May for the plaintiff's benefit in this lawsuit.  (Doc. 51 at 13-14).  No doubt, but that circumstance likewise is irrelevant to May's status as an independent contractor or agent.

## CONCLUSION

Although the defendant can establish that B&W acted as the plaintiff's agent in retaining May, and that B&W was authorized to hire a subagent for service of process, he cannot establish that May was an agent rather than an independent contractor.  Because May's agency is an essential element of the defendant's counterclaim against the plaintiff, the counterclaim necessarily fails. For the reasons set forth above, the plaintiff's motion for summary judgment is **granted**.  The defendant's counterclaim is **dismissed with prejudice**.

DONE and ORDERED this 8th day of April, 2022.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE