# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **WILLIAM HARRISON, et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **CIVIL ACTION 20-0360-WS-N** |
| | ) |
| **STEVE JAMES FORDE,** | ) |
| | ) |
| **Defendant.** | ) |

## ORDER

This matter is before the Court on the defendant's motion for summary judgment. (Doc. 102).[1]  The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 46-1 to -3, 50, 61-1 to -2, 103, 105, 106), and the motion is ripe for resolution.  After careful consideration, the Court concludes that the motion is due to be granted in part and denied in part.

## BACKGROUND

Mao Zedong is sometimes credited with the apocryphal observation that "there is great chaos under heaven and the situation is excellent."  On March 11, 2020, the World Health Organization declared Covid-19 a pandemic, unleashing a chaotic global clamor for personal protective equipment ("PPE"), which created an excellent situation for the making of fortunes.  This case serves as a cautionary tale that, while chaos may provide opportunity for profit, it also breeds confusion and risk.

The plaintiffs in this diversity action are William Harrison and Cathexis Holdings, L.P. ("Cathexis").  According to the third amended complaint, (Doc.

---

[1] Technically, the motion is one for partial summary judgment, as the defendant acknowledges that Count I will remain pending even if his motion is entirely successful. (Doc. 102 at 1).

88), Kristian Agoglia was the manager of, and a member of, Helanbak, LLC ("Helanbak"). In the spring of 2020, Harrison and Agoglia as individuals formed an unnamed joint venture ("the JV") to source and supply PPE to large-scale buyers. In early April 2020, the defendant entered a contract with Harrison, Agoglia, Helanbak, and/or the JV to supply three million respirator masks for $6,660,000. Cathexis wired this sum from one of its bank accounts to one of the defendant's accounts on April 9, 2020. The defendant never delivered the masks, and he returned only $1,000,000 of the sum delivered to him. In February 2022, Agoglia, Helanbak, and the JV (collectively, "the Assignors") executed an assignment agreement assigning to Harrison all their right and interest in the agreement with the defendant (both original and as modified) and in this lawsuit, including all causes of action arising out of them. (Doc. 88-1).

The third amended complaint includes six causes of action. Those claims, and the plaintiff(s) asserting them, are as follows:

- Breach of contract (Harrison)

- Conversion (Harrison and Cathexis)

- Fraud (Harrison)

- Promissory fraud (Harrison)

- Unjust enrichment (Harrison and Cathexis)

- Money had and received (Harrison and Cathexis)

**EVIDENTIARY SYNOPSIS**

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). "Therefore, the [non-movants'] version of the facts (to the extent supported by the record) controls, though that version can be supplemented by additional material cited by the [movant] and not in tension with the [non-

movants'] version." *Rachel v. City of Mobile*, 112 F. Supp. 3d 1263, 1274 (S.D. Ala. 2015), *aff'd*, 633 Fed. Appx. 784 (11th Cir. 2016).  The following synopsis follows these rules.

Cathexis is a limited partnership.  Harrison is not a partner in Cathexis, but he is its sole beneficial owner.  (Doc. 50-1 at 6-7).[2]  Helanbak is a limited liability company as to which Agoglia is managing member and 49% owner  (his wife holding the other 51%).  (Doc. 50-2 at 19; Doc. 50-3).

Harrison had capital but no experience with buying and selling PPE, while Agoglia had such experience but less capital.  (*Id*. at 5).  On April 2, 2020,[3] Harrison and Agoglia formed the JV, pursuant to which Agoglia would manage the JV's business and have authority to enter contracts on behalf of the JV, while Harrison would supply a baseline of 95% of the money for the deals.  (Doc. 50-2 at 26-28).  The parties contemplated using their entities, including Helanbak and Cathexis, in fulfilling the JV's purpose.  (*Id*. at 6).

In the spring of 2020, Colorado Tech Supply ("CTS") had relationships with manufacturers of PPE located in China, and the defendant had a relationship with CTS for the supply of PPE from such sources.  (Doc. 50-4 at 5).

On April 2, Agoglia and the defendant first made contact, via a text from the defendant.  (Doc. 50-2 at 29; Doc. 50-4 at 6).  Agoglia responded that he would "get William and call you back."  (Doc. 50-2 at 29).  The three held a teleconference that day, during which Agoglia identified Harrison to Forde as his "partner in the deal."  (Doc. 50-2 at 7).

---

[2] According to the third amended complaint, but not backed up by any evidence to which the plaintiffs have cited, the limited partners of Cathexis are three trusts, as to each of which Harrison is the sole individual trustee and the sole member of the entity trustee. The general partner of Cathexis is a limited liability company, the sole members of which are the same three trusts.  (Doc. 88 at 2).

[3] All dates are 2020.

At this time, Agoglia was attempting to quickly fulfill an existing purchase order from Leesar for three million KN95 masks, which purchase order was set to expire by its terms on April 17. (Doc. 50-2 at 6, 24). The defendant represented he could get masks into the country very quickly, which was an essential element of the deal. (*Id*. at 7).

Around noon on April 9, the defendant sent an invoice for $6.66 million, (Doc. 50-1 at 19), saying the money needed to be sent over first thing. Minutes later, the defendant represented to Agoglia that the masks were produced and an aircraft secured, departing China on Sunday, April 12. (Doc. 50-2 at 10, 24, 126-27). In reliance on this information, Harrison and Agoglia agreed to proceed, and Cathexis wired $6.66 million from one of its accounts into the defendant's personal account ("the 4599 account") with Pinnacle Bank ("Pinnacle") on the afternoon of April 9. (Doc. 50-1 at 9, 17, 20; Doc. 50-2 at 8, 24, 30; Doc. 50-4 at 9; Doc. 50-6 at 23).

The balance in the 4599 account just before the $6.66 million hit was $7,750.87. (Doc. 50-6 at 1). On April 9, the defendant transferred $6.0 million from the 4599 account into another of his personal accounts ("the 5821 account"). (*Id*. at 2, 41). On April 10, the defendant transferred another $660,000 from the 4599 account into the 5821 account. (*Id*.). The balance in the 5821 account just before these transfers was $1,264.54. (*Id*. at 41-42). On April 10, the defendant transferred $1,950,000 back from the 5821 account into the 4599 account. (*Id*. at 1, 42). On April 10, the defendant transferred out of the 5821 account: $2.925 million to CTS; $1 million to Cathexis; and $771,194.32 to various creditors and other accounts controlled by the defendant. (*Id*. at 42). Also on April 10, the defendant transferred out of the 4599 account an additional $44,000 to another payee unrelated to the mask transaction. (*Id*. at 40).

Around 5:00 a.m. on April 10, Agoglia requested Pinnacle to freeze the wired funds due to uncertainty whether the order would be fulfilled. (Doc. 50-2 at 12). He and the defendant spoke by telephone that morning, following which the

defendant sent an email explaining that the factory had released the masks sourced for the order but proposing to fulfill the order with other KN95 masks already secured.  (Doc. 50-2 at 137).  Agoglia responded that he would "check with [his] partner," and Harrison was included on this and subsequent emails.  (*Id*. at 137-38).  Agoglia asked for details, and the defendant responded that he "[d]efinitely ha[d]" three million masks from the same manufacturer, to be delivered at the rate of 250,000 – 450,000 a day for seven days.  (*Id*. at 138).  During conversations on the morning of April 10, Agoglia advised the defendant that the masks had to be from a factory on the FDA's approved list (which list he at that time sent the defendant) and usable in the medical industry.  (*Id*. at 15-16, 34).  On the afternoon of April 10, agreement was reached to move forward under this plan, with Forde to wire $1 million back to Cathexis, most of which would be returned to the defendant upon delivery of the masks.  (*Id*. at 140).  Agoglia and Harrison had wanted all the money back but, in reliance on the defendant's representations, Agoglia advised Pinnacle that the defendant was free to wire the funds as the defendant should direct.  (*Id*. at 14-15, 24, 130).

No later than the morning of April 13, the defendant knew the factory was not on the FDA's approved list.  (Doc. 50-5 at 13-15).  On that date, he requested a wire transfer of $150,000 from the 4599 account to a creditor, which order was completed by Pinnacle the following morning.  (Doc. 50-6 at 8; Doc. 105-3 at 2; Doc. 105-4 at 2).

The factory was not going to start production until it received 50% payment.  (Doc. 50-5 at 7).  On April 10 the defendant wired $2.925 million, representing this amount, to CTS.  On April 13, CTS wired $1.5 million of this amount to its Asian contact, which would ultimately wire it to the manufacturer; however, April 13 was a Chinese bank holiday.  (*Id*. at 7, 10).  CTS did not wire the balance of the 50% deposit to its Asian contact until April 15.  (*Id*.).

Early on the afternoon of April 14, Agoglia texted the defendant with concerns that KN95 masks were becoming unsellable due to state restrictions and

asking him to "see if we can cancel the order." (Doc. 50-2 at 33-34). The defendant responded shortly afterwards that the order could not be canceled, and he did not subsequently state otherwise. (*Id*. at 16). Canceling the order on April 14 would have been messy but, had the defendant requested it, CTS would have attempted it, including not sending the balance of the 50% deposit. (Doc. 50-5 at 13). Early on the afternoon of April 14, the defendant engaged in a number of calls with CTS, during which CTS asked if the defendant wanted to cancel production over the FDA listing issue; the defendant said he did not want to cancel production. (*Id*. at 15). On April 15, CTS sent the balance of the 50% deposit. (*Id*. at 10).

On the morning of April 15, the defendant advised that the manufacturer had already produced half the order and that, as soon as FDA approval of the manufacturer (predicted to be "imminent") occurred, shipment would occur and the product would arrive and clear Customs in four to seven days. As an alternative, the defendant proposed a different manufacturer, already FDA-approved, who could supply three million masks through Customs in late April at a rate of a million masks a day. (Doc. 50-4 at 160). Also on April 15, the defendant sent images of what he said were masks produced by the first factory, along with a PPE test report and a technical data sheet. (Doc. 50-4 at 167-80).

On April 17, the defendant sent CTS another $1,045,000 from the 4599 account for 1.1 million masks that were ready to ship. (Doc. 50-4 at 12; Doc. 50-6 at 27). Abrupt changes in FDA rules at that time required the masks to be stamped as not for medical use, and they were not delivered stateside. (Doc. 50-4 at 12-13; Doc. 50-6 at 21-22).

On May 2, Harrison texted the defendant, "You going to be able to cancel/refund my order?" The defendant replied, "Yes. I will call you later today with details." (Doc. 50-1 at 30). On May 7, the defendant texted that in twelve days he would have collected enough on other invoices to cover Harrison. (*Id*. at 31). He also stated that he could send cash as it comes in and would "pay it down

as I can." (*Id.* at 32).  On the same day, the defendant texted Agoglia that he was trying to "get Williams money together." (Doc. 50-4 at 85).  On May 19, the defendant texted that his first wire refund "[s]hould be this week."  (Doc. 50-1 at 34).  Later in May, Harrison asked if the defendant would "send my money back this week," to which the defendant responded that he was "working through it and will get it sorted out."  (*Id.* at 35).  In August, Agoglia asked the defendant if there was "[a]ny plan on getting William back his money," with the defendant responding that he was "trying to sell his KN's for him."  (Doc. 50-2 at 115-16).

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden."  *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial."  *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made."  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a

genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

"There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); *accord Gennusa v. Canova*, 748 F.3d 1103, 1116 (11th Cir. 2014). The Court accordingly limits its review to those arguments the parties have expressly advanced.

The parties have submitted the entirety of several depositions and several lengthy exhibits (often redundant), totaling well over 600 pages,[4] even though they cite to only a modest fraction of them. This practice violates Civil Local Rule 5(a) ("If discovery materials are germane to any motion or response, only the relevant portions of the material shall be filed with the motion or response."). A party may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting his position. *E.g., HRCC, Ltd. v. Hard Rock Café International (USA), Inc*., 703 Fed. Appx. 814, 816 (11th Cir. 2017); *accord Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 672 (10th Cir. 1998). On motion for summary judgment, the parties must "cit[e] to *particular parts* of materials in the record," and "[t]he court need consider only the cited materials …." Fed. R. Civ. P. 56(c)(1)(A), (3) (emphasis

---

[4] Actually, hundreds more, when one accounts for four deposition pages appearing on each page of exhibit.

added).  Accordingly, the Court limits its evidentiary review to those pages expressly relied on by the parties in their briefs.

## I. Breach of Contract.

Count I alleges that the defendant "offered to sell Harrison and/or one or more of the Assignors" the three million respirator masks for $6,660,000, and that "Harrison and/or one or more of the Assignors accepted" the offer, forming a contract.  (Doc. 88 at 10).  The defendant argues he is entitled to summary judgment to the extent Harrison bases his claim on anything other than his status as Helanbak's assignee.  (Doc. 103 at 10).  According to the defendant, "[t]here is no credible evidence that Forde entered into a valid and enforceable agreement with Harrison, individually, or with any alleged assignor other than Helanbak.  … Rather, the evidence shows that Forde was dealing with Helanbak to purchase and sell masks on Helanbak's account."  (*Id*. at 13).

There is evidence tending to support the defendant's position.  For example, on April 2, counsel for Harrison and Agoglia sent the defendant a proposed contract (which was never executed), pursuant to which "the Company [defined as "Helanbak, LLC"] engages [the defendant] to provide certain services to the Company," with "the Company [to] pay" the defendant for the masks, and the signatories identified as the defendant and "Helanbak LLC."  (Doc. 61-1 at 9-13).  On April 9, the defendant sent an invoice identifying the "vendor" as "Helanbak, LLC," with "Kristian Agoglia" appearing on the second line and Helanbak's business address on the third line, (Doc. 46-2 at 19), apparently without protest that Helanbak was not the contracting party.  From April 9 forward, Agoglia repeatedly communicated with the defendant through his Helanbak email (kristian@helanbak.com), with each such email including as the signature line, "Kristian Agoglia Vice President Helanbak."  (Doc. 61-1 at 2).[5]

---

[5] *See, e.g.,* Doc. 46-1 at 17-18, 20-21; Doc. 46-2 at 22; Doc. 50-1 at 26; Doc. 50-2 at 126-27).

There is, however, also evidence tending to support Harrison's position. For example, the defendant initially made contact with Agoglia by text (not Helanbak email) on April 2.  (Doc. 50-2 at 29; Doc. 50-4 at 6).  Agoglia responded he would "get William and call you back."  (*Id*.).  The three held a teleconference that day, during which Agoglia introduced Harrison to Forde as his "partner in the business deal."  (Doc. 50-2 at 7).  After the defendant notified Agoglia that the masks initially identified to fulfill the order were unavailable, Agoglia emailed the defendant on April 10, "Let me check with my partner to make sure we want to proceed."  (*Id*. at 137).  Within the hour, Agoglia emailed the defendant again, stating that "[w]e are willing" to consider an alternative source, but "[w]e would like" to know the details, that if the defendant could share them and "provide us" a new delivery schedule, "we" would let him know if "we" want to proceed.  (*Id*. at 138).  That afternoon, the defendant responded to Agoglia, with a cc to Harrison, confirming he could fulfill the order from the same manufacturer.  (*Id*.).  In the succeeding days, the defendant continued to send email updates on fulfillment to both Agoglia and Harrison.  (Doc. 50-4 at 160-61).  On May 2, Harrison texted the defendant, "You going to be able to cancel/refund *my* order," with the defendant responding, "Yes. I will call you later today with details," without objecting that it was Helanbak's order, not Harrison's.  (Doc. 50-1 at 13, 30 (emphasis added)).  In August, Agoglia asked the defendant if there was "[a]ny plan on getting William back his money," with the defendant responding that he was "trying to sell *his* [not Helanbak's] KN's for him."  (Doc. 50-2 at 115-16 (emphasis added)).

The defendant replies that he did not know the JV existed and did not know of Harrison's specific role vis-à-vis the mask purchase.  (Doc. 106 at 2).  He criticizes Agoglia's repeated statements to him that Harrison was Agoglia's partner as "cryptic" and "ambiguous," (*id*. at 2, 3), without explaining how his

10

admission that the language used carries more than one reasonable meaning[6] could compel summary judgment in his favor.

The fatal deficiency in the defendant's motion is as much legal as evidentiary. The parties agree that the contract claim is governed by Tennessee law,[7] but the defendant cites no case or statute, and articulates no test, rule or principle, by which the identity of the contracting parties is to be determined under Tennessee (or any other) law. Nor does he address the evidence that Tennessee law permits, requires, or prefers for establishing the identity of the contracting parties or the weight to be assigned to any of it. In this legal vacuum, the Court is unable to rule as a matter of law that Harrison cannot establish that he, Agoglia, and/or the JV were parties to the contract with the defendant.

As the defendant notes, an element of a breach of contract claim is "damages caused by the breach." (Doc. 103 at 11). The defendant argues that, regardless of who the contracting parties are, only Helanbak has been damaged by his alleged breach. His reasoning is that he dealt with Helanbak, not Harrison, and that Harrison (through Cathexis) provided the funding by agreement with Helanbak, not with the defendant. (*Id*. at 13-14). This, however, is only another way of saying that the defendant contracted exclusively with Helanbak. If Harrison (or Agoglia and/or the JV) was in fact a contracting party, the defendant agreed with him (or it or them) to provide the masks, and Harrison (or Agoglia and/or the JV) has been damaged by not receiving the masks promised by the defendant.

---

[6] For purposes of contract construction, a term is ambiguous only if it is "susceptible to more than one reasonable interpretation." *Allstate Insurance Co. v. Watson*, 195 S.W.2d 609, 611 (Tenn. 2006); *accord Ace American Insurance Co. v. Wattles Co*., 930 F.3d 1240, 1252 (11th Cir. 2019) (Georgia law).

[7] (Doc. 103 at 10; Doc. 105 at 14).

## II. Conversion.

The third amended complaint alleges that that Harrison ultimately controls Cathexis.  It alleges that Harrison paid the defendant $6.66 million for the masks by an April 9 wire transfer from a Cathexis account but that the defendant instead wrongfully spent over $1 million of these funds on personal debts and investments.  (Doc. 88 at 1-2, 6-7, 9-10).  Count II alleges that the defendant thereby wrongfully and intentionally converted this property of Harrison and/or Cathexis.  (*Id*. at 11).  The plaintiffs identify the amount at issue as approximately $1.7 million.  (Doc. 105 at 17).[8]

The parties agree that Alabama law governs the plaintiffs' tort claims.  (Doc. 103 at 10; Doc. 105 at 17, 21).  "To constitute conversion, there must be a wrongful taking or a wrongful detention or interference, … or an illegal use or misuse of another's property."  *Green Tree Acceptance, Inc. v. Tunstall*, 645 So. 2d 1384, 1386 (Ala. 1994) (internal quotes omitted).  "Conversion requires a wrongful exercise of dominion over property in exclusion or defiance of a plaintiff's rights, where said plaintiff has … the immediate right of possession." *Id*. (internal quotes omitted).  Cash may be the subject of conversion only "if the cash at issue is specific money capable of identification."  *Id*. (internal quotes omitted).  The defendant challenges the plaintiffs' ability to establish each of these elements.

The defendant says there was no "wrongful taking," because the $6.66 million was wired to him voluntarily.  (Doc. 103 at 15).  The plaintiffs respond that what they assert is an "illegal use" of the funds following transfer, (Doc. 105 at 18), which is consistent with the third amended complaint.  (Doc. 88 at 9 (alleging the defendant "wrongfully spent" funds on personal debts and investments)).

---

[8] The plaintiffs exempt from their conversion claim the $3.97 million the defendant wired to CTS.

The defendant argues that his use of the funds for personal and unrelated businesses expenses "is neither wrongful nor illegal," because "there is no evidence that the terms of the agreement required that the funds be held intact to be used solely to purchase the masks." (Doc. 103 at 17). The defendant offers no legal authority for the astonishing proposition that, absent express instruction to the contrary and "an escrow or similar earmarking agreement," (*id*.), a middleman is free to take funds, received from a purchaser for the express purpose of acquiring property for the purchaser, and instead use the funds for the middleman's own purposes. Without such authority, the defendant's argument must be rejected.

The defendant argues that, once it wired the funds to him, Cathexis had no immediate right of possession because Cathexis at that point "became a creditor of Helanbak, not Forde." (Doc. 103 at 15). Without identifying any supporting evidence, the defendant asserts that this is so because "[t]he evidence is undisputed that Helnabak [sic] was to repay the purchase funds back to Cathexis once Helanbak consummated sale of the masks." (Doc. 106 at 4). Even if the defendant's factual assertion is correct, he offers no authority for the proposition that, as a matter of Alabama conversion law, a supplier of funds to one entity on behalf of a second entity has no right to immediate possession of the funds when the first entity reneges. By the defendant's reasoning, if a father paid a dealer for a car sold to his son, the son having agreed to repay the father over time, the father could not successfully demand that the dealer return the funds when it fails to relinquish the car but could look only to his son. If that bizarre result is indeed the law, the defendant should be able to demonstrate that it is. Having made no attempt to do so, he cannot secure summary judgment on this basis.[9]

---

[9] As the plaintiffs note, (Doc. 105 at 19), the defendant returned $1 million directly to Cathexis, and the defendant fails to explain how his doing so is consistent with his present argument.

The defendant similarly argues that Harrison individually had no immediate right of possession because, while Harrison may control Cathexis and may be its sole beneficial owner, Cathexis is a separate legal entity.  (Doc. 103 at 15-16). This is not an unreasonable argument, but it falls short because the defendant merely assumes, rather than demonstrates, that under Alabama law an immediate right of possession for purposes of a conversion claim can inhere only in a closely held entity, to the exclusion of the sole manager and sole beneficial owner of the entity.[10]  Nor does the defendant address the plaintiffs' argument that he acknowledged his awareness that the wired funds were Harrison's.  (Doc. 105 at 19).[11]

The defendant argues that the funds did not remain "specific and identifiable" at the moment he allegedly converted them to his personal use, because they were not initially deposited into an escrow or other segregated account but were instead placed in an account (the 4599 account) that already contained other funds, resulting in a fatal commingling.  Moreover, the defendant continues, he immediately removed the wired funds from the 4599 account and later placed other funds of unknown origin into that account.  (Doc. 103 at 17-18).

"[W]hen funds are segregated into a separate account, such as an escrow account, those funds may be the subject of a conversion."  *Willingham v. United Insurance Co. of America*, 628 So. 2d 328, 333 (Ala. 1993).  The 4599 account

---

[10] Nor, to the extent it may matter for purposes of the conversion claim, has the defendant addressed Harrison's status and rights vis-à-vis Cathexis, its LLC general partner, its trust limited partners, and the trustees under the laws of whatever jurisdiction(s) may govern those relationships.

[11] On May 7, the defendant texted Agoglia that he was trying to "get *Williams* [not Cathexis's] money together." (Doc. 50-4 at 85 (emphasis added)).  Later in May, Harrison asked if the defendant would "send *my* money back this week," without drawing an objection that it was Cathexis's money, not Harrison's.  (Doc. 50-1 at 35 (emphasis added)).  In August, Agoglia asked the defendant if there was "[a]ny plan on getting William back *his* money," again without drawing an objection that it not Harrison's money but Cathexis's.  (Doc. 50-2 at 115-16 (emphasis added)).

had a balance of $7,750.87 when the $6,660,000 wire transfer was received. (Doc. 50-6 at 23). This means that, at the time of transfer, the wired funds represented 99.89% of the monies in the account. As the defendant notes, he "immediately withdr[ew]" the wired funds from the 4599 account "in their entirety." (Doc. 103 at 17-18). The defendant makes no attempt to show that, under Alabama law, a momentary connection with other funds one one-thousandth the size of the subject funds precludes a conversion claim, and the Court will not make that substantial leap on its own.

The defendant says the plaintiffs "have presented no evidence that the funds returned to the [4599] account were the same funds that left the account." (Doc. 106 at 5). Except they have. The defendants' own bank statements reflect that he transferred the $6.66 million from the 4599 account to the 5821 account on April 9 and 10. (Doc. 50-6 at 23-24, 41). Just prior to those deposits, the balance in the 5821 account was $1,264.54. (*Id*. at 41-42). The wired funds from Cathexis thus represented approximately 99.98% of the funds in the 5821 account. Before any additional funds were deposited in the 5821 account, the plaintiff on April 10 transferred $1,950,000 back to the 4599 account. (*Id*. at 23, 42). Those funds plainly are a portion of the funds wired from Cathexis.[12]

---

[12] Following the retransfer, the wired funds from Cathexis represented 99.6% of the 4599 account's balance. No other funds were deposited in that account until April 24. (Doc. 50-6 at 23). On April 10, the defendant withdrew over $44,000, (*id*. at 24, 40), vastly more than exhausting the $7,750.87 in non-Cathexis funds available. Every withdrawal from April 11 through April 23 necessarily was of Cathexis-provided funds, and those withdrawals (excluding a $1,045,000 wire to CTS) exceeded $400,000. (*Id*. at 25-29). Between April 24 and May 4, the defendant deposited a miniscule $477.38 into the 4599 account. (*Id*. at 23). During the same time period, his withdrawals totaled well over $400,000, (*id*. at 29-37, 40), and so necessarily were also drawn on Cathexis-provided funds. A similar picture emerges regarding the 5821 account. After the partial retransfer back to the 4599 account on April 10, funds wired from Cathexis represented approximately 99.96% of the 5821 balance. No other funds were deposited in the account until April 27. (*Id*. at 41). On April 10 alone, the defendant withdrew (excluding wire transfers to Cathexis and CTS) over $771,000, (*id*. at 42), only about $1,200 of which could have come from non-Cathexis funds.

**III.  Fraud.**

Count III alleges three instances of misrepresentations of existing fact by the defendant:  (1) on April 9, that he had already secured three million masks and had an aircraft reserved to ship them within 48 hours of receipt of payment; (2) on April 10, that he had already secured a different three million masks, which could be delivered at the rate of 250,000 – 450,000 a day for seven days; and (3) on April 15, that the images he sent were the masks he had secured to fulfill the order. (Doc. 88 at 12-13).

Count IV alleges four instances of promissory fraud by the defendant:  (4) on April 10, that three million substitute masks could be sourced and would be delivered in smaller shipments within a two-week period; (5) on April 15, that he would deliver the masks within two weeks; (6) on May 2, that he would issue Harrison a full refund; and (7) on multiple occasions, promising Harrison and Agoglia that he would return Harrison's money.  (Doc. 88 at 14-15).

The Court addresses each claim separately and in the order the third amended complaint presents them.  The Court notes that, while Harrison is the sole plaintiff under the fraud claims, he sues not only in his own right but also as the assignee of any fraud claims of Agoglia, Helanbak, and the JV; thus, in describing the evidence and argument in this context, the Court uses "Harrison" to encompass the assignors as well as Harrison.

With respect to April 9, the defendant does not challenge Harrison's ability to establish the alleged misrepresentations or detrimental reliance in the form of wiring him $6.66 million.  Instead, he argues that any initial reliance on his alleged misrepresentations, and any damage resulting therefrom, was "eviscerated" (a non-legal term by which he apparently means something like, "rendered legally absent or irrelevant") by the April 10 modified agreement, pursuant to which the contracting parties agreed that the defendant would return $1 million, retain $5.66 million, and provide the three million masks from the

same manufacturer on a different timeline.  (Doc. 103 at 19-20).  The Court cannot follow the defendant's reasoning.  The detrimental reliance, and damage, on April 9 was parting with $6.66 million, and the first alleged fraud, if any, was complete on that date.  On April 10, the defendant already had the money, so the reliance on his April 10 alleged misrepresentations was not in sending the money but in allowing the defendant to retain most of it, and the damage was loss of the return of the money before the defendant siphoned it off.[13]  Harrison cannot recover double compensatory damages, but he is free to show that the defendant defrauded him twice in as many days and free to seek punitive damages for each instance of fraud.[14]

     With respect to April 10, there is evidence that the defendant stated he "[d]efinitely ha[d]" three million masks coming from the same manufacturer, which "will be delivered" in lots "for 7 days."  (Doc. 50-2 at 138).  The defendant denies that Harrison has evidence that this representation was false.  (Doc. 103 at 20).  The defendant, however, has not shown what "[d]efinitely have" means.  The

---

[13] To the uncertain extent the defendant suggests that Harrison's willingness to proceed on April 10 disproves as a factual matter the existence of reliance and/or damages on April 9, that may be a permissible inference for a jury to draw, but it is not a compelled one due to the different circumstances.  Most obviously, a willingness to proceed in order to salvage funds already transferred is not the same as a willingness to transfer funds initially.

[14] It is of course possible that a jury could determine that the defendant committed fraud on April 9 but not on April 10, or *vice versa*.  Even were the defendant's argument otherwise colorable, he has not shown that Harrison can be compelled to choose between a fraud claim based on April 9 misrepresentations and a fraud claim based on April 10 misrepresentations.

     The defendant correctly notes that Harrison attempts in brief to expand the scope of their fraud claim to include additional, related representations on April 2 and April 9, as well as the suppression of certain information.  (Doc. 105 at 23).  While evidence of such alleged misrepresentations and suppressions may be admissible at trial for certain purposes, they cannot form additional bases of recovery for fraud, because they lie beyond the clear and limited scope of Counts III and IV.

parties appear to equate "have" with "secured," (*id.*; Doc. 105 at 24), but they do not explain or support what the latter term means.  If, as Harrison's argument suggests, it means the masks were already manufactured,[15] there is evidence this was not so on April 10, since the factory was not going to begin production until receiving a 50% deposit, which did not occur before April 15.  (Doc. 50-5 at 7).  Without establishing what "definitely have" means, the defendant cannot obtain summary judgment for lack of evidence of falsity.

With respect to April 15, the defendant argues that Harrison has no evidence the images the defendant sent were not of masks he had secured to fulfill the order.  (Doc. 103 at 20-21).  Because Harrison identifies no evidence that the images on which the claim was based were not in fact of masks the defendant had secured to fulfill the order, (Doc. 105 at 10, 21-26), this portion of the fraud claim is due to be dismissed.

With respect to promissory fraud on April 10 and April 15, the defendant argues first that he made no promises but only provided "update[es] on the status of a transaction to which Helanbak was already committed."  (Doc. 103 at 22).  This could not possibly be so as to April 10, since the representations on which that promissory fraud claim is based preceded the existence of the modified agreement/transaction.  As for April 15, a properly functioning jury could find that statements:  that FDA approval was imminent; that over a million masks would ship immediately upon approval; and that the shipment would clear Customs within 4-7 days thereafter, (Doc. 50-4 at 160), were representations regarding future events and not merely "updates."  Certainly the defendant offers no explanation for his contrary position.

The defendant next argues that Harrison cannot prove that, when he made the alleged misrepresentations on April 10 and 15, the defendant lacked the

---

[15] Harrison suggests that the defendant's April 10 representation was that all three million masks would be delivered within a week of April 10, (Doc. 105 at 24), which presumably could not occur unless the masks were already manufactured.

present intent to perform.[16]  He argues that his conduct in wiring $2.925 million to CTS on April 10 "destroys" (another non-legal term, by which he presumably means something like, "negates") the absence of an intent to perform the promises he made earlier on the same day.  (Doc. 103 at 22; Doc. 106 at 9).  The defendant points also to his wiring of an additional $1.045 million to CTS on April 17, and to evidence of his efforts to ensure the masks would come from an FDA-approved manufacturer, as eliminating any fact issue as to his intent.  (Doc. 103 at 22-23).  This is not insignificant evidence regarding intent, but it is not the only evidence.

Harrison begins by noting that circumstantial evidence is sufficient to establish a present intent not to perform and that such evidence may relate to events both preceding and following the alleged promissory fraud.  *Heisz v. Galt Industries, Inc*., 93 So. 3d 918, 926 (Ala. 2012).  (Doc. 105 at 22).  Neither side otherwise addresses the parameters, if any, established by Alabama law for assessing the existence *vel non* of a present intent not to perform, and the Court will not supply the deficiency.  This means that the Court must assume that all the evidence to which Harrison points is permissible evidence of such an intent.

Harrison notes that the defendant immediately began diverting wired funds to his personal use, including over $800,000 on April 10 alone, another $150,000 on April 14, and about $1.7 million by early May.  (Doc. 105 at 24).  Since $2.925 million represented no more than half the cost of the masks to the defendant, these diversions greatly exceeded whatever profit the defendant might have been anticipating on the deal.  The defendant replies that all this evidence shows is that he would have had to come up with the balance of the cost to him "from other sources," (Doc. 106 at 10), but he fails to show, or even assert, that he could have done so.  Nor does he explain how the possibility of him finding other moneys to

---

[16] "[T]he second element of promissory fraud [is] that the promisor have, at the time the representation is made, a present intent not to perform."  *General Motors Acceptance Corp. v. Covington*, 586 So. 2d 178, 182-83 (Ala. 1991).

pay for the promised masks drains his diversion of funds delivered to him for that purpose of all evidentiary value.

Harrison argues that the defendant's massive and immediate diversion of wired funds on April 10 is evidence that he never intended to supply the masks he promised on April 10 but that he instead made the promises in order to obtain release of the wired funds and with the intention of using the funds, once released, for his own pressing personal reasons.  (Doc. 105 at 26).  The defendant offers no additional response.

Harrison also points to evidence that the defendant falsely represented on April 14 that the mask order could not be canceled.  Harrison argues that the defendant did so because, were the order canceled, he would have been unable to return the million or so dollars he had by then diverted to his own use, thus exposing his fraudulent scheme to obtain the funds without acquiring the masks for which the funds were sent.  (Doc. 105 at 24-25).  The defendant objects to the use of this evidence, on the grounds it lies "outside the scope" of the third amended complaint.  (Doc. 106 at 6).  The Court agrees that Counts III and IV do not identify the defendant's April 14 statement as to cancellation as a separately actionable fraud, but Harrison is not seeking recovery for this alleged misrepresentation; rather, he is using evidence that this representation was false to support the narrative that the defendant never intended to perform pursuant to his April 10 and April 15 representations but instead engaged in serial misrepresentations (including on April 14) to further and conceal the fraud.  The defendant's only other argument is his contrary read on the evidence regarding the feasibility of cancellation, (*id.* at 7), but the weighing of competing evidence and inferences is for the jury, not the Court.

Finally, Harrison argues that the defendant's continuing need to hide his diversion of funds (and permit further diversion) supports the inference that his alleged April 15 misrepresentations regarding future delivery were made without a present intention to fulfill them but instead to prevent or delay discovery of his

fraudulent and otherwise wrongful conduct.  (Doc. 105 at 25-26).  Again, the defendant offers no response beyond that addressed above.

As to April 15 promissory fraud, the defendant offers one additional argument:  that after April 10 and the release of the wired funds, Harrison did not materially change his position and suffered no additional damages, leaving him unable to establish two elements of the promissory fraud claim based on April 15 representations.  (Doc. 103 at 24).  The argument fails for reasons already provided in addressing the defendant's similar argument regarding April 9. Harrison changed his position in reliance on the alleged April 15 misrepresentations by allowing the plaintiff to continue to retain the wired funds, and he was damaged by the misrepresentations because the defendant thereafter continued to divert the funds, up to an additional $700,000.  As stated before, Harrison cannot recover his full compensatory damages more than one time, but he can certainly seek that recovery under different theories and for different wrongs, and he can seek punitive damages for each separately proven fraud.

Moving on to the alleged May 2 promissory fraud, the defendant describes the text exchange on which this claim is based as "cryptic" and his assurance of a refund as not "unconditional."  (Doc. 103 at 23; Doc. 106 at 10).  The entire exchange reads as follows:

Harrison:      "You going to be able to cancel/refund my order?"

Forde:         "Yes.  I will call you later today with details."

(Doc. 50-1 at 30).  The defendant identifies nothing on the face of this exchange that is remotely ambiguous.  Instead, he notes that he had by April 17 sent $3.97 million to CTS, which "as time went on was unrecoverable."  (Doc. 103 at 23). The defendant identifies no evidence to support the proposition that this sum was unrecoverable but, more importantly, he does not explain the relevance of such a state of affairs.  In his reply brief regarding May 2, he says that Harrison's assertion that he was entitled to a full refund on demand "is unsubstantiated." (Doc. 106 at 10).  The defendant misunderstands the summary judgment

procedure.  This is his motion, so the initial burden is on him to show that the law, or the contract, or something, assigns to Harrison the risk of loss upon the defendant's failure to perform.  Because he has not done so, his argument fails.[17]

The defendant does not address the claim of promissory fraud after May 2. That portion of the fraud claim thus remains intact.

In his reply brief, the defendant presents a new argument:  that Harrison in his individual capacity suffered no damages from the defendant's alleged fraud because it was Cathexis, and not Harrison individually, that furnished the wired funds.  (Doc. 106 at 6).[18]  As the Court has ruled many times, courts ordinarily do not consider arguments first raised on reply,[19] and the defendant offers no reason the Court should stray from its usual rule in this instance.

## IV.  Unjust Enrichment.

Count V alleges that, by accepting and retaining $5.66 million without providing the three million masks, the defendant has been unjustly enriched. (Doc. 88 at 16-17).  The parties agree that this equitable claim is governed by Alabama law.  (Doc. 103 at 24-25; Doc. 105 at 27).

"To prevail on a claim of unjust enrichment under Alabama law, a plaintiff must show that:  (1) the defendant knowingly accepted and retained a benefit, (2)

---

[17] Finally, the defendant points to evidence that he received 1.1 million masks against the order and tried to sell them for Helanbak's benefit.  (*Id.*).  His evidence is that he received the masks in June 2020, that they had been paid for with the wired funds the defendant sent to CTS,  but that they were not usable in the medical industry, as the agreement (per the plaintiffs) required.  (Doc. 46-1 at 9-10).  Whatever the significance of the defendant's tardy delivery of non-conforming goods and his efforts to sell them, it does not negate Harrison's claim of fraud on May 2.

[18] Counts III and IV allege that the JV was also damaged by the defendant's fraud, (Doc. 88 at 14, 16), and Harrison is the JV's assignee of any fraud claim.  (Doc. 88-1 at 2).  The defendant does not argue that Harrison as JV's assignee cannot show damage from his alleged fraud.

[19] The Court has referenced this rule in this very case.  (Doc. 65 at 12 n.13).

provided by another, (3) who has a reasonable expectation of compensation." *Matador Holdings, Inc. v. HoPo Realty Investments, L.L.C.*, 77 So. 3d 139, 146 (Ala. 2011) (internal quotes omitted).

The defendant, whose one-paragraph argument relies exclusively on the foregoing quote from *Matador Holdings*, assumes rather than argues that only Cathexis, to the exclusion of Harrison, "provided" a benefit to the defendant. (Doc. 103 at 25). Without demonstrating what "provided" means under Alabama law in the context of an unjust enrichment claim, the defendant cannot show that Harrison's management and beneficial ownership of Cathexis does not suffice to satisfy that element of his claim.

The defendant argues that Cathexis had no "reasonable expectation of compensation" from him but only from Helanbak. (Doc. 103 at 25). Again, the defendant offers nothing but his *ipse dixit*, with no exploration of what suffices under Alabama law as a reasonable expectation of compensation. To return to the example described in Part II, the defendant has made no effort to show that, as a matter of Alabama law, a father who pays a dealer for a car sold to his son, pursuant to the son's agreement to repay the father, has no claim against the dealer for unjust enrichment if the dealer stiffs the son but must instead look only to his son for reimbursement. Moreover, and as the plaintiffs note, (Doc. 105 at 27), the defendant's direct reimbursement to Cathexis of $1 million belies his assertion that Cathexis had no reasonable expectation of compensation from him.

Finally, the defendant argues he has not been unjustly enriched as to the $3.97 million he sent to CTS, because he did not "retai[n] the benefit" of those funds. (Doc. 103 at 25). This assertion has a certain superficial plausibility, but it suffers from a familiar lack of legal authority or analysis. Left unexamined is whether Alabama law confines the term to property still under the defendant's control or whether it extends as well to property the defendant allows to be dribbled away without corresponding benefit to the plaintiff. On motion for

summary judgment, the failure to demonstrate the parameters of Alabama law is fatal.

**V.  Money Had and Received.**

Count VI alleges that the $5.66 million was improperly wired to the defendant due to mistake or fraud, that he has no right or claim to the funds, and that he has retained the funds despite requests for return.  (Doc. 88 at 17).  The parties agree that this equitable claim is governed by Alabama law.  (Doc. 103 at 25; Doc. 105 at 26).

The defendant says that a claim for money had and received "in essence is a claim for unjust enrichment," and he seeks summary judgment "[f]or the reasons discussed" with respect to the unjust enrichment claim.  (Doc. 103 at 25).  Because the defendant's motion fails as to the unjust enrichment claim, it necessarily fails as to this claim as well.

<b>CONCLUSION</b>

For the reasons set forth above, the defendant's motion for summary judgment is **granted** with respect to the plaintiffs' claim for fraud under Count III based on the April 15 representation described in paragraph 68 of the third amended complaint and is in all other respects **denied**.

DONE and ORDERED this 4th day of January, 2023.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE